UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LILIAN DIAKOW,

        Plaintiff,

v.

OAKWOOD HEALTHCARE, INC., d/b/a
OAKWOOD SOUTHSHORE MEDICAL
CENTER,

        Defendant.

_____/

Case No. 15-11411

Honorable Nancy G. Edmunds

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT [26] AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [28]**

This employment dispute comes before the Court on cross motions for summary judgment. Plaintiff's claims arise from Defendant's failure to renew her on-call physician contract. Plaintiff brings claims pursuant to the Americans with Disabilities Act (ADA), 42 U.S.C. § 12117, which incorporates and references § 706 of Title VII, 42 U.S.C. § 2000e-5 (Count I), and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., age discrimination (Count II). (Compl. ¶ 1.) The Court held a hearing on these motions. For the reasons stated below, Plaintiff's motion for summary judgment (dkt. 26) is denied and Defendant's motion for summary judgment (dkt. 28) is denied in part and granted in part.

**I.    Background**

    **A.  Plaintiff's Employment History**

Plaintiff, Lilian Diakow, M.D. ("Plaintiff" or "Dr. Diakow"), graduated from medical school in 1952. (Diakow Dep. 16, Pl.'s Mot. Summ. J. Ex. 1, dkt. 26-1.) She took a residency in obstetrics and gynecology (OB/GYN) at Providence Hospital between 1953 and 1956. (Diakow Dep. 16.) Until June 2014, she had a private medical practice in Wyandotte, Michigan, and through the years she had hospital privileges at both Henry Ford Wyandotte (HFW) and Seaway Hospital in Trenton, which later became Oakwood Southshore ("Defendant" or "Southshore"). (Diakow Dep. 17-19, 21.)

In addition to private practice, hospital privileges, and a contract to perform faculty preceptor duties 3 half-days per week, Plaintiff had on-call contracts at Southshore.[1] (Diakow Dep. 31:5-16, 33-35.) This additional coverage of Southshore's OB/GYN department was pursuant to a separate written contract. (Diakow Dep. 30:17-20.) These two-year contracts provided an hourly wage for nighttime on-call emergency coverage. (Diakow Dep. 72:11-22.) Plaintiff's most recent on-call contract was executed in December 2008, when she was 80 years old, and amendments to extend its terms were signed through June 2011, when she was 83, and through June 2013, at age 85. (Diakow Dep. 72-74; Physician Employment Agr. Ex. A, Def.'s Mot. Summ. J. Ex. 5, dkt. 28-5.) It is also worth noting that on July 16, 2009, at the age of 81, Plaintiff was appointed Secretary of the OB/GYN department for a 4-year term. (Diakow Dep. 91:17-25.) She was reappointed in May 2013, at age 85, for three more years. (Diakow Dep. 91:17-25.)  Both letters of

---

[1]Dr. Diakow started the "doctor-in-the-box" or "doctor on duty in the OB department" program at Wyandotte General (now HFW), and she later started the same program at Southshore. (Diakow Dep. 21:18-19, 25:7-11.) Under the doctor-in-the-box ("on call") program, the doctors covered night shifts with members from their department who were also referred to as the on-call physician. (Diakow Dep. 30:8-23.)

appointment were signed by Edith Hughes, President of Oakwood Southshore Medical Center, and Dr. Nasir. (Diakow Dep. 91.)

Plaintiff's physician employment agreement with Oakwood Southshore Medical center, dated January 1, 2009, contains a job description at Exhibit B with a list of job duties. (Employment Agr. Ex. B, 135-36, Pl.'s Mot. Summ. J. Ex. 2, dkt. 26-2.) There were certain medical procedures which Plaintiff decided that she was not going to do. (Diakow Dep. 51.) Plaintiff testified that the only procedure she did not perform was laparoscopy, and she alleges that the other procedures which she had crossed off the list of hospital privileges were procedures that noone at her hospital performed as far as she knew, and that some of these procedures were performed at high-risk hospitals. (Diakow Dep. 54-55.) The job description also included "teaching residents and medical students." (Employment Agr. Ex. B, 135-36, Pl.'s Mot. Summ. J. Ex. 2, dkt. 26-2.)

When Plaintiff was working in the on-call role at Southshore, there would be one physician staffing the OB department on each particular night or weekend shift and usually one resident.  (Diakow Dep. 51:19-52:16.) During the on-call schedule, the only exception to having a resident scheduled on OB/GYN duty was the third Thursday of each month on the day shift, during which time the residents had their monthly didactic meeting with the state-wide campus system. (Seibles Dep. 26, Pl.'s Mot. Summ. J. Ex. 3, dkt. 26-3.)

Defendant ended Dr. Diakow's on-call services on October 29, 2013, by failing to renew her contract; Dr. Diakow alleges that she was terminated. (Diakow Dep. 45-47.) After Plaintiff's on-call services contract ended, she maintained staff privileges. (Diakow Dep. 37:7-17.) Plaintiff also continued her employment as an on-call physician at HFW even after

3

her employment with Defendant ended. (Diakow Dep. 22.) Plaintiff completely retired from the practice of medicine on September 1, 2015.

### B.  Facts Related To Plaintiff's Position At Defendant Southshore

On November 15, 2012, Plaintiff injured her calf muscle when getting out of her car on a windy night at HFW. When she turned around to retrieve her tote bag from the car, the wind snapped the car door back into her leg. (Diakow Dep. 95.) Despite being in pain, she carried out her duties that evening and had x-rays taken at Southshore the following morning. (Diakow Dep. 95.) On November 28, 2012, Plaintiff followed up with her orthopaedic doctor, Dr. Kevin Sprague. (Sprague records 11/28/12, Pl.'s Mot. Summ. J. 7, dkt. 26-7.)  Dr. Sprague recommended physical therapy, which Plaintiff attended a few times, but the appointments conflicted with her schedule and the therapist said she could continue the exercises at home. (Diakow Dep. 102.) For a couple of months following the injury, Plaintiff occasionally used a wheelchair to cover longer distances, for example from the OB department to the clinic or to her office. (Diakow Dep. 97-98.)

On December 10, 2012, Hughes was forwarded an email from Martha Williams, Clinical Nurse Manager of the Birthing Unit, which read:

> It has become a concern of the OB staff that Dr. Diakow may not be physically able to perform her duties as it relates to being the in house OB Physician. She has been observed using a wheelchair to navigate through the unit, including into patient rooms. The concern rests with whether she can perform a crash C/Section or Vaginal Delivery without the assistance of another physician. Please note, once a month she is working without even Resident coverage.
>
> After discussion (today) with Dr. Glines, yourself and Juliet Hafford I am advised to forward my concern back to you for further review and followup.

4

(Williams Email, Dec. 10, 2012, Def.'s Mot. Summ. J. Ex. 6, 28-6.) As discussed below, Nurse Williams agreed in her testimony that after Plaintiff's accident, there was at least one occasion where she thought it took a long time for Plaintiff to walk from the sleep room to surgery. (Williams Dep. 20:21-25, Def.'s Mot. Summ. J. Ex. 7, dkt. 28-7.) Williams also testified that Plaintiff's "inability to stand through a surgery leaving the surgery to the residents was a concern," and that Williams had "observed on more than one occasion [Plaintiff] stepping back and sitting down during surgery." (Williams Dep. 22-23.) Williams further testified that she had seen Plaintiff stopping on her way to the delivery room in an emergency situation and that Williams' perception was that "it appeared that she was stopping to rest." (Williams Dep. 35.)

On April 11, 2013, Plaintiff attended a meeting with Hughes and Craig Glines, D.O., at which time her injury was a topic of conversation. (Diakow Dep. 99; Glines Dep. 10, Def.'s Mot. Summ. J. Ex. 3, dkt. 28-3.) Plaintiff testified that at the meeting, Hughes informed her that "she had heard that I had to be wheelchaired from patients' rooms," which Plaintiff denied, and that Plaintiff's limping around was not a good image for the hospital. (Diakow Dep. 100.) Hughes also gave Plaintiff a list of physicians to contact to be reevaluated at Oakwood. (Diakow Dep. 100.)  Plaintiff informed Hughes that she had been treated by Dr. Sprague, also at Oakwood, yet she was not asked to bring in a note from Dr. Sprague regarding whether she was fit to perform the job. (Diakow Dep. 100-01.) Hughes admits she did not give Plaintiff a written letter requesting that Plaintiff provide a physical medicine and rehabilitation (PMR) physician's report to her. (Hughes Dep. 17:18-20, Def.'s Mot. Summ. J. Ex. 8, dkt. 28-8.)

Plaintiff attended an appointment with one of the doctors on Hughes' list, Dr. Sham Juratli, who notified Plaintiff that she had a tissue injury and should continue with therapy. (Diakow Dep. 102.) Plaintiff did not get a return-to-work slip or other documentation regarding her ability to work and testified that Hughes had not requested one, or Plaintiff certainly would have gotten one. (Diakow Dep. 103.) Hughes testified that she and Plaintiff met again in May 2013 and Plaintiff admitted she had seen a PMR physician, yet she did not produce any documentation. (Hughes Dep. 22:1-6.)

Dr. Glines testified that as to Plaintiff's work between December 2012 and October 2013, it was his own observation "of her ambulating around" and the "increasing concerns of the nursing staff" who were "starting to ramp up their complaints," that called into question Plaintiff's physical ability to do the job. (Glines Dep. 81:5-13.) He testified that his "observation was she had a hard time ambulating down the hallway without stopping to rest." (Glines Dep. 82:5-11). If he walked down the hallway with her, they would "be stopping about every 20 feet . . . ." (Glines Dep. 82:5-11.)

Dr. Glines further testified that on or about April 18, 2013, when he was in Lansing at an educational forum with the residents, he responded to a call from the ER resident, Dr. Kelley, about a patient who came into the ER and was bleeding a lot. (Glines Dep. 119:17-120:18.) According to Dr. Glines, Dr. Kelley indicated that "he had contacted Dr. Diakow [the in-house on-call physician that day] and told her that he had a ruptured ectopic and that -- and her response was, well, I don't do that kind of procedure, surgery, or whatever the exact word was and that she didn't come down. So he did not know what to do since she was the only gynecologist there and there were no residents." (Glines Dep. 120:17-25.) Dr. Glines advised Dr. Kelley to call Dr. Seibles "[t]o get in there and see that patient and

6

have her get Dr. Diakow and go down . . . , take care of this," and that was Dr. Glines' "understanding" of what had happened. (Glines Dep. 122:17-22.)

Dr. Glines recommended to Hughes that Plaintiff's on-call services contract not be renewed. (Glines 18:25-19:3.) Hughes testified that she was the decision-maker who decided not to renew Plaintiff's contract in 2013, and that she had consulted with Dr. Glines, though he was not the final decision-maker. (Hughes Dep. 7:1-9, Plaintiff's Mot. Summ. J. Ex. 8, dkt. 26-8.) She did not consult with anybody in personnel at Oakwood main hospital nor did she consult with the human resources department at Southshore in deciding not to renew Plaintiff's on-call contract. (Hughes Dep. 7:10-16.)

Plaintiff points out that it is undisputed that there was no complaint, patient injury or medical malpractice claim or disciplinary charge brought against her. (Pl.'s Mot. Summ. J. 5.)  Plaintiff also argues that it is undisputed that she never requested an accommodation from Defendant. (Pl.'s Mot. Summ. J. 6.) Additional facts supported by the record and relevant to the analysis herein are included below.

Plaintiff brings her motion for summary judgment alleging that Defendant is unable to raise an issue of disputed fact on the perception of impairment (Pl.'s Mot. Summ. J. 16); Defendant has no objective evidence (legitimate basis) to require a medical examination, and such a demand may not be made in the absence of being job related and consistent with a real business necessity; Defendant does not have any evidence to support a case of direct threat to the safety and welfare of others; and Defendant has not provided evidence from which a jury could draw a reasonable conclusion that Dr. Diakow was impaired in her essential job functions or was a direct threat. (Pl.'s Mot. Summ. J. 31.) Defendant brings its motion for summary judgment arguing that Plaintiff cannot establish

7

a claim of disability discrimination pursuant to the ADA because her alleged impairment prevented her from performing essential functions of her job, that Defendant's request to have Plaintiff examined by a physiatrist was job-related and consistent with business necessity and did not violate the Americans with Disabilities Act ("ADA"), Defendant's failure to renew Plaintiff's on-call services contract did not violate the ADA, and finally, that Plaintiff cannot establish a claim of age discrimination.

## II.   Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).   Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Rule 56 also provides that

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or

(4) issue any other appropriate order.

Fed. R. Civ. P. 56(e). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party." *Hager v. Pike Cnty. Bd. Of Educ.*, 286 F.3d 366, 370 (6th Cir. 2002).

## III.   Analysis

### A.   Whether Plaintiff Can Establish A Claim Of Disability Discrimination

"To recover on a claim for discrimination under the ADA, a plaintiff must show that he or she (1) is disabled, (2) otherwise qualified to perform the essential functions of the position, with or without accommodation, and (3) suffered an adverse employment action because of his or her disability." *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016) (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996)). "Under the ADA, the term 'disability' means a physical or mental impairment that substantially limits one or more major life activities of an individual; a record of such an impairment; or being regarded as having such an impairment." *Id.* at 892 (citing 42 U.S.C. § 12102(1)).

9

Plaintiff does not allege that she is disabled, but rather that she was regarded as disabled and that for this reason, her contract was not renewed. (Pl.'s Mot. Summ. J. 18; dkt. 26.) "Individuals may be regarded as disabled when (1) [an employer] mistakenly believes that [an employee] has a physical impairment that substantially limits one or more major life activities, or (2) [an employer] mistakenly believes that an actual, nonlimiting impairment substantially limits one or more [of an employee's] major life activities." *Id.* at 893 (quoting *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008)). "Major life activities include, but are not limited to, . . . walking, standing, . . ., and working." *Id.* at 893. "[A]n individual may fall into the definition of one regarded as having a disability if an employer ascribes to that individual an inability to perform the functions of a job because of a medical condition when, in fact, the individual is perfectly able to meet the job's duties." *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1106 (6th Cir. 2008)(citation omitted).

While Plaintiff argues that she is entitled to summary judgment because Defendant "regarded" her as disabled, Defendant argues that "Plaintiff cannot show that she could perform the essential functions of a nighttime, on-call OB physician," and therefore her claim must fail. (Def.'s Mot. Summ. J. 16, dkt. 28); *see also Jennings v. Dow Corning Corp.*, 2013 WL 1962333, at *9 (E.D. Mich. May 10, 2013) ("To succeed on his claim, Plaintiff must also show that [s]he is 'otherwise qualified' for the . . . position.").

### 1. Essential Functions of the Job

It is undisputed that Defendant concluded that Plaintiff could not perform the essential functions of the on-call physician position and failed to renew/terminated her on-call services contract after it expired in June 2013. (Def.'s Mot. Summ. J. 2.) . Defendant "does

10

not dispute that [Plaintiff] could perform many aspects of [her] job" and limits the issue to "her ability to timely respond to emergency situations and handle them completely on her own when she was the only licensed OB physician in the hospital during on-call coverage." (Def.'s Mot. Summ. J. 16, dkt. 28.)

An individual is "otherwise qualified" if she "can perform the 'essential functions' of the job in question." *Estate of Mauro v. Borgess Med. Ctr.*, 137 F.3d 398, 402 (6th Cir. 1998) (citation omitted). Normally the inquiry involves whether the individual can perform the essential functions "with or without reasonable accommodation," however when a plaintiff is "regarded as" being disabled, "the employer is not required to entertain or consider reasonable accommodations." *Jennings*, 2013 WL 1962333, at *9 (citing 42 U.S.C. § 12201(h); *Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 467 (6th Cir. 1999)).

The parties agree that the employment agreement job description includes "performing vaginal and cesarean deliveries for clinic patients, Dr. (sic) No patients and private patients (attending physician is not present)." (Job Description -- In House OB/GYN Physician, Def.'s Mot. Summ. J. Ex. 5, dkt 28-5; Pl.'s Resp. 3; dkt. 32.) Plaintiff in her deposition agreed that it was "important for an on-call or supervising doctor" to be able to "safely deliver babies" and "perform C-sections and other surgical procedures." (Diakow Dep. 110:10-17, Def.'s Mot. Summ. J. Ex. 1, dkt. 28-1.) She further agreed that it was important for the on-call doctor to be able to "get to any emergency situation quickly," and "be able to stand and perform all of the surgical procedures that the residents are performing in case there's a problem." (Diakow Dep. 110:18-111:2.)

Defendant points out that the job description requires that the "physician will be involved in the evaluation and treatment of all complex patients in triage until they are

11

stabilized for transfer, admitted or their physician is in house." (Job Description -- In House OB/GYN Physician, Physician Employment Agr., Ex. B, 135, Def.'s Mot. Summ. J. Ex. 5.) Plaintiff admits that she stopped doing some surgeries (prior to her injury), yet argues that the job description does not require performing "major surgeries", and that the job "calls simply for supervision of the labor and delivery area, nurses, residents, training of the same and vaginal and caesarian section deliveries." (Pl.'s Br. in Opposition 3.)

Defendant shows that Plaintiff testified, "I cut out doing surgery when Dr. Danz became ill. I only did sections. I did not do any majors after that." (Diakow Dep. 122:18-20.) Plaintiff also testified that there were certain procedures, such as laproscopies, that Plaintiff did not perform, because she "saw the complications that happened with laproscopies, so [she] chose not to expose [herself]" and if a laproscopy needed to be done while she was on call, she had two other doctors available as a backup. (Williams Dep. 41-43.) Defendant argues that this testimony, as well as evidence from Nurse Martha Williams that the nurses had to wait "an uncomfortable amount of time" for Plaintiff to respond in a "crash" situation, "is sufficient in itself to establish that Plaintiff was not otherwise qualified to perform all aspects of the OB on-call position" and therefore, her claim must fail.[2] (Def.'s Mot. Summ.

---

[2] It is worth noting Williams' testimony in more detail because it is not exactly as Defendant had characterized it in the brief by stating that "Williams, herself, had experienced multiple situations where a fetus' heart tone had dropped, creating a "crash" situation, promoting the nurse to yell for the doctor, and having to wait 'an uncomfortable amount of time' for Plaintiff to arrive". (Def.'s Mot. Summ. J. 7, citing Williams' Dep. pp. 21-22 and 34.) Williams' testimony was as follows:

Q: What was the emergent situation? What was going on?
A: These situations, and I don't want to speak to a particular situation, but these situations in general are situations where you have a labor patient, the baby's heart tone has dropped, it's a crash situation. The nurse opens the door and says I need the Doc in the Box, I need the Doc in the Box now. The person at the nurse's station and myself pick up

the phone, Dr. Diakow, we need you now and then you wait for her to arrive or whoever the Doc in the Box would be.

Q. And did she arrive?

A. Yes.

Q. Was there any harm to that particular patient?

A. I am not aware of the length of time it took her to get there resulting in harm to a patient.

Q. Were you personally present waiting for her to arrive?

A. I have been personally present waiting for her to arrive.

Q. And then she arrived, and as far as you know the appropriate decision and the appropriate thing was done with respect to the patient?

A. Yes.

Q. Anything like that other than that (sic) that you recall that was alarming to you?

A. The inability to stand throughout a surgery leaving the surgery to the residents was a concern.

Q. Well, tell me about what surgery you observed after her accident presumably on a day shift where –

A. More often on a day shift but it was not always.

Q. – where you observed that she was unable to stand during a surgery?

A. What's the question exactly?

Q. Let me ask it a different way.

A. Okay.

Q. Is it your testimony that you observed on at least one occasion, maybe more, than (sic) you personally observed that Dr. Diakow became physically distressed, tired, or was unable to stand during a surgery when she was needed during a surgery?

A. I've observed on more than one occasion her stepping back and sitting down during a surgery.

Q. What's wrong with that?

A. It's hard to imagine that you can supervise a surgery if you're sitting away from the surgical arena.

Q. It's hard for you to imagine because you're not a surgeon; right?

A. I'm not a surgeon. But –

. . .

A. It was a concern.

Q. It was a concern to you?

A. A concern, yes.

Q. Any harm to the patient?

A. I'm not aware of any harm to any patient.

(Williams Dep. 21:10-23:15.)

On page 34 of the deposition, again cited by Defendant, Williams testified:

Q. Well, why don't you explain again what your concern was with respect to the wait time between Dr. Diakow coming from the sleep room to the delivery room? How would you say

J. 17, dkt. 28; Williams Dep. 21-22.)

Distilled, there is an argument by Defendant that Plaintiff could not perform a "crash C-section" on her own– a "solo crash C-section." Plaintiff refers to this as "an improbably remote hypothetical and impossible standard" pointing out the following:

- The employment agreement D-130 provides that "Oakwood will provide those clinical . . . support services ("Support Services") that Oakwood deems necessary to enable physician to provide services." (Def.'s Mot. Summ. J. Ex. 5 D at 130.);

- Shania Seibles, D.O., and Stephanie Crain, D.O., each testified that they were never called upon to perform a solo crash C-section and Dr. Seibles could not remember hearing of a doctor performing a crash C-section unassisted by a doctor or resident. (Seibles Dep. 22-23, 29-30, Pl.'s Mot. Summ. J. Ex. 3, dkt. 26-3; Crain Dep. 26, Pl.'s Mot. Summ. J. Ex. 11, dkt. 26-11.);

---

it in your words?

. . .

Q. And I'm only asking you of your own knowledge what you personally observed?

A. Just that it would be an uncomfortable length of time that it would take her to get to the patient from the phone call to the patient.

Q. [By Ms. Hiser] Did you ever observe her stopping along the way?

A. At the nurse's station, yes, she would stop.

Q. And this was during a time when there was an emergency called into a delivery room?

[Mr. Vining objects]

A. Yes.

Q. Based on your understanding and your perception was there any reason for Dr. Diakow to stop at the nurse's station along the way?

[Mr. Vining objects]

A. There wouldn't be a reason, but it appeared that she was stopping to rest. That was just my perception.

(Williams Dep 34:4-35:8.)

- Nurse Williams testified that for a C-section there would be three nurses present, the surgeon and one or two resident surgeons. (Williams Dep. 23-24, 30.)

Neither party is entitled to summary judgment on this issue. The parties show that there is a genuine question of fact as to whether Plaintiff was able to perform the essential functions of an on-call physician.

### 2. Whether Oakwood's Request To Have Plaintiff Examined By A Physiatrist was Job-Related and Consistent with Business Necessity

Plaintiff claims that Defendant violated the ADA by making "unjustified requests for evaluation." (Compl. ¶ 32.) The ADA prohibits employers from requiring a medical examination or making inquiry about the nature or severity of a disability, unless the employer can show that the examination or inquiry is "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). To show that an examination is job-related and consistent with business necessity, the employer has the burden of showing that "(1) the employee requests an accommodation; (2) the employee's ability to perform the essential functions of the job is impaired; or (3) the employee poses a direct threat to himself or others." *Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir. 2014) (citation omitted); *Bates v. Dura Auto. Sys., Inc.*, 767 F.3d 566, 581-82 (6th Cir. 2014). Further, the employer must reasonably believe based on objective evidence that a medical examination is necessary to prevent harm to the business. *Kroll*, 763 F.3d at 623.

There is no dispute that Defendant requested that Plaintiff be seen by a specialist. On April 11, 2013, Edith Hughes and Dr. Glines met with Plaintiff and Hughes asked Plaintiff to be evaluated by a Physical Medicine and Rehabilitation (PMR) specialist, giving Plaintiff a list of Oakwood PMR physicians. (Hughes Dep. 17:4-17; Diakow Dep. 99:13-100:101:22;

15

Daily Notes, Thursday, April 11, 2013, Def.'s Mot. Summ. J. Ex. 9, dkt. 28-9.)

Plaintiff admits that she did not request accommodation. Defendant instead argues that it had sufficient evidence from which to believe "that Plaintiff was impaired in her ability to perform the on-call duties and that she posed a direct threat to patients." (Def.'s Mot. Summ. J. 20.) "An employer may request a medical examination when 'there [is] significant evidence that could cause a reasonable person to inquire as to whether [the] employee is still capable of performing [her] job." *Kroll*, 763 F.3d at 624 (quoting *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999)). "An employee's behavior cannot be merely annoying or inefficient to justify an examination; rather, there must be genuine reason to doubt whether that employee can 'perform job-related functions.'" *Id.* (quoting *Sullivan*, 197 F.3d at 811). Further, "the decision to require a medical examination was justified only if it was reasonably based on objective evidence known to" the individual who made the decision to obtain the examination. *Id.* at 623. Evidence shows that Hughes, with Dr. Glines present, requested that Plaintiff be examined by a physiatrist. (Hughes Dep. 16:15-18, Def.'s Mot. Summ. J. Ex. 8, dkt. 28-8.) Hughes testified that the "greatest concern" with Plaintiff "has always been her stamina and her ability to move quickly," and that is why she asked for the evaluation. (Hughes Dep. 39:2-4.)

Defendant relies on *Barnum v. Ohio State University Medical Center*, 642 Fed. Appx. 525 (6th Cir. 2016), wherein the Sixth Circuit found that there were circumstances that constituted "significant evidence that would cause a reasonable person to inquire whether [the] employee is still capable of performing [her] job." *Id.* at 532. These included information that "there were numerous concerns expressed about [the plaintiff's] inability to concentrate and at least one instance where she could not perform a routine task," and

16

the department chair had also been "informed that one of [the plaintiff's] concerned coworkers reported that [the plaintiff] had made a comment suggesting suicidal thoughts." *Id.* at 533. In *Barnum*, there was a detailed account of the instance in which the plaintiff could not perform the routine task of raising an operating table; as well as providing the identification of the individual who had overheard the suicidally suggestive comment. *Id.* at 527-28.

As examples, Defendant cites Hughes' observations and her reliance on the observations of Dr. Glines and Nurse Williams. (Def.'s Mot. Summ. J. 19.) Yet Plaintiff raises genuine issues of fact as to the objective merit, and even the admissibility, of some of this information. For example, Hughes was the recipient of Williams' December 10, 2012 email which expressed the concerns of "OB staff" that Plaintiff may not be physically able to perform her duties, and noted that Plaintiff had been observed using a wheelchair to navigate through the unit. (Williams Email, Dec. 10, 2012, Def.'s Mot. Summ. J. Ex. 6, dkt. 28-6; Hughes Dep. 9:25-10:6.) Yet when Nurse Williams was deposed, she was unable to identify which nursing staff had expressed concerns about Dr. Diakow:

> Q. You requested the meeting [with Hughes]?
> A. Yes.
> Q. Was the purpose of the request to discuss Dr. Diakow?
> A. Yes.
> Q. What did you tell Ms. Hughes in the meeting?
> A. That there was a concern reported to me by my staff that they were concerned that physically she wouldn't be able to handle the responsibilities of being the OB on-call physician.
> Q. Which of your staff members told you that (sic) that they were concerned?
> A. You've asked me that before and I can't recall exact names. I don't have a list of who came to me. It was several nurses.

(Williams Dep. 26:6-19.)

Similarly, Dr. Glines' testimony of first-hand accounts was limited:

Q. . . . but what I'm asking you right now, let me be more specific, do you have any evidence that she couldn't do a Cesarean (sic) section on her own?
A. I have evidence from – I observed a couple cases and – I can't give you specifics, but over the past few years and also from what I heard from, again, nurses, anesthesiologists, residents, and other attendings.
Q. So what did you personally observe, Dr. Glines, over the past couple of years?
A. [Begins describing coming into work in the evening, when Dr. Diakow was in the middle of a C-section twin delivery with two residents] . . . and they were having a hard time getting the second baby out . . . . Dr. Diakow was in the second assist position and the two residents were struggling and I walked in and looked and I kept saying T the uterus, T the uterus, you have to open it further, and I felt that that should have been said earlier, and so finally they did that. Of course, you know, that's a big repair job then, but it's something that has to be done for the safety of the baby, and Dr. Diakow made the comment, well, I'm glad you're here, I need a coffee break, and then she broke scrub and left and I took over the case.
Q. Okay. Was this prior to her leg injury or was this after her leg injury?
A. I don't know. I don't recall the exact time of the case. It was within the last few years.
Q. All right. Any other case that you – that comes to mind that you personally observed in the past couple years that left you to believe that she was unable to work on a crashed  – crash delivery?
A. That I personally observed, no.

(Glines Dep. 31-32, Pl.'s Mot. Summ. J. Ex. 4, dkt. 26-4.)

Hughes had observed Plaintiff using the wheelchair in the hallways, or stopping and leaning against the wall and holding onto an available railing. (Hughes Dep. 10:9-22.) In January 2013, when Hughes saw Plaintiff at a meeting and Plaintiff was sitting near, but not in, the wheelchair in which she had come to the meeting, Hughes asked her if she could walk and Plaintiff responded yes. (Hughes Dep. 11-12.)  Hughes admits that the complaints about Plaintiff's ability to move around that came from "other physicians" were made to Dr. Glines, and not to her, and she relied on what Dr. Glines had to say about them. (Hughes Dep. 24:10-25.) Similarly, with respect to the nursing staff concerns, Hughes relied on what Williams set forth in the December 2012 email. (Hughes Dep. 25:1-16.)

18

Plaintiff argues in part that there is an absence of an objective indication of a failure of performance. (Pl.'s Mot. 21.) Plaintiff also sets forth evidence including Dr. Crain's testimony that she had performed two C-sections with Dr. Diakow without incident.

> Q. Did (sic) during these two incidents that you recall, did you have any concern that Dr. Diakow didn't know what she was doing or wasn't doing things correctly?
> A. No.

(Crain Dep. 29:6-9.)

The parties have shown that material questions of fact exist as to whether Defendant could have reasonably concluded that Plaintiff was unable to perform the essential functions of her job. Defendant has shown some evidence to support a reasonable belief that a medical examination was job-related and consistent with business necessity. Yet the information relied upon by Defendant is also such that a jury may conclude that Defendant could not reasonably have concluded that Plaintiff was unable to perform the essential functions of her job.

With respect to whether Defendant had reason to determine that Plaintiff was a direct threat to patient safety, "[a]n employee poses a 'direct threat' when she creates 'a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation.'" *Kroll*, 763 F.3d at 625 (quoting 42 U.S.C. § 12111(3)). Defendants again appear to argue that Plaintiff could not have quickly attended to a crash C-section, nor would she have the stamina to perform, should one occur. As set forth above, there are questions of fact as to whether Plaintiff posed a safety risk and whether Hughes was justified in requesting that she submit to a medical examination. There are genuine issues

of disputed fact and the Court denies summary judgment to both parties on issues related to Hughes' verbal request for a medical examination.

### 3. Whether Defendant's Failure To Renew The On-Call Services Contract Violated The ADA

Plaintiff alleges that as a "direct and proximate cause of being a person regarded as having an impairment she was subjected to actions prohibited by the ADAA including . . . the ultimate discharge from her employment." (Compl. ¶ 32.) Plaintiff's on-call services contract expired in June 2013 and Defendant did not renew it. Despite that expiration, Plaintiff continued to maintain staff privileges, her private practice at Oakwood and her faculty preceptor duties. (Diakow Dep. 37:7-17.)

As set forth above, Plaintiff has provided evidence from which a jury could find that Defendant regarded her as disabled, for example the December 11, 2012 email from Martha Williams, Clinical Manager, Birthing Unit, to Valerie Koczara, with carbon copy to Craig Glines and Juliet Hafford, then forwarded as an "FYI" to Edith Hughes:

> It has become a concern of the OB staff that Dr. Diakow may not be physically able to perform her duties as it relates to being the in house OB Physician. She has been observed using a wheelchair to navigate through the unit, including into patient rooms. The concern rests with whether she can perform a crash C/Section or Vaginal Delivery without the assistance of another physician. Please note, once a month she is working without even Resident coverage.
>
> After discussions (today) with Dr. Glines, yourself and Juliet Hafford I am advised to forward my concern back to you for further review and followup.

(William Email Dec. 10, 2012, Pl.'s Mot. Summ. J. Ex. 13.) Further, Hughes testified that Plaintiff's contract was not renewed because "her stamina and her ability to move quickly during an emergency." (Hughes Dep. 8-9.)

20

Defendant, however, bases its motion for summary judgment on the argument that Plaintiff's claim must fail because she was not "otherwise qualified" for the position of an OB on-call physician. (Def.'s Mot. Summ. J. 21.) As set forth above, there are material issues of fact as to whether Plaintiff remained able to perform the duties of the on-call physician position. For this reason, the Court denies the parties' cross motions for summary judgment on this issue.

### B. Whether Plaintiff Can Establish A Claim Of Age Discrimination

Plaintiff brings a claim of age discrimination, alleging that she was treated differently from similarly situated younger employees. (Compl. Count II.) "The ADEA [Age Discrimination in Employment Act] provides, in relevant part, that '[i]t shall be unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's age.'" *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (quoting 29 U.S.C. § 623(a)(1) (emphasis added)). Defendant argues that Plaintiff cannot make this showing and therefore, summary judgment on this issue is appropriate. The Court agrees.

For ADEA claims, a plaintiff may establish a prima facie case of age discrimination by producing direct or circumstantial evidence. *See Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 725 (6th Cir. 2012). In response to Defendant's motion, Plaintiff argues that the following circumstances are "direct evidence" that unlawful discrimination based on age was at least a motivating factor in Defendant's actions: comments that Plaintiff's limping was a bad image for the hospital, comments that management had lost confidence in her abilities; giving Plaintiff a list of doctors to see; holding repeated meetings as to Plaintiff's

21

abilities even though she continued performing her duties; and terminating Plaintiff from the on-call position based upon the alleged lack of stamina and ability to move quickly. (Pl.'s Resp. 22, dkt. 32.)

Case law does not extend the label of direct evidence to comments made by every manager or decision maker in the corporate setting. *See Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 433 (6th Cir. 2002). "Any discriminatory statements must come from decisionmakers to constitute evidence of discrimination. Statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself cannot suffice to satisfy the plaintiff's burden of demonstrating animus." *Geiger v. Tower Auto.*, 579 F.3d 614, 620-21 (6th Cir. 2009) (citations omitted). Edith Hughes, the division president at the time Dr. Diakow's contract was not renewed, testified that she was the decision-maker who decided not to renew Dr. Diakow's contract in 2013, and although she consulted with Dr. Glines, "he was not the final decision-maker." (Hughes Dep. 5:14, 7:1-9.) Hughes testified that she "did not renew the contract because of her [Plaintiff's] stamina and her physical ability to move quickly in an emergency situation." (Hughes Dep. 8:22-9:4.) Plaintiff testified that at an April 11, 2013 meeting with Hughes and Dr. Glines, Hughes told her that she had heard that Plaintiff had to use a wheelchair to move from patients' rooms, which Plaintiff denied. (Diakow Dep. 100:4-13.) Plaintiff further testified that she was told "that [her] limping around was not a good image for the hospital. And [she] answered that the hospital is full of injuries and wheelchairs and stretchers and crutches . . . ." (Diakow Dep. 100:4-13.) There is no evidence that the comment was related to age, and Plaintiff admits that this was the meeting at which time her "injury was brought up." (Diakow Dep. 99:25.) Plaintiff also testified that at this meeting she was given a list of doctors to see. (Diakow

22

Dep. 101:17-19.) Again, there is no evidence that this was connected to age, rather than injury.

Plaintiff's reliance on *Weberg v. Franks*, 229 F.3d 514, 523-26 (6th Cir. 2000), for the premise that "association of an adverse employment action with stigmatizing beliefs creates a genuine issue of material fact," is misplaced.  In *Weberg*, a case of reverse racial discrimination, Robinson, the warden, "openly admitted that he would terminate an employee simply because of the 'perceptions of inmates,' and that he had in fact done just that. He further indicated that he felt 'strongly' that plaintiff should be terminated '[s]imply because she was white and she was in a black housing unit.'" *Id.* at 524. "[I]f believed, Robinson's statements lead to the conclusion that anti-white animus motivated the employment decision he made regarding Plaintiff." *Id.* Here, despite Hughes' ready admission that Plaintiff lacked "stamina" and "quick movement," there is no evidence that Hughes operated under stigmatizing beliefs related to age. To the contrary, Hughes had already renewed Plaintiff's contract when Plaintiff was in her eighties. Plaintiff admits that Defendant did "not directly" use "any words stating 'old' or 'age'." (Pl.'s Resp. 22; dkt. 32.) Plaintiff puts forth no evidence that Hughes' concerns that Plaintiff lacked "stamina" and "quick movement" was related to anything other than her injury or perceived disability, as set forth above. Plaintiff provides no direct evidence of age-related discriminatory intent sufficient to withstand Defendant's motion for summary judgment on this issue.

Plaintiff also argues that she can show age discrimination by disparate treatment where she was ultimately replaced by younger doctors for the on-call position. The Court agrees with Defendant's position that despite Plaintiff's characterization of this evidence as "direct," it is indirect or circumstantial evidence, as further evidenced by Plaintiff's own

23

statement that this evidence of disparate treatment "raises an inference that age was an illegal factor." (Pl.'s Resp. 23.) In order to sustain an ADEA claim with circumstantial evidence under the *McDonnell Douglas* burden-shifting framework, Plaintiff must first establish a *prima facie* case by showing that she: (1) belonged to a protected class (e.g. was over 40 years of age); (2) suffered adverse employment action; (3) was qualified for the position held when the adverse action was taken; and (4) was replaced by a younger worker. *See DiCarlo v. Potter*, 358 F.3d 408, 417 (6th Cir. 2004) (*overruled on other grounds by Gross*, 557 U.S. at 180) (citing *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1159–60 (6th Cir.1990)); *see also Moore v. AMPAC*, 645 Fed. Appx. 495, 498 n.1 (6th Cir. May 20, 2016) ("the ADEA protects employees over the age of 40"); *Isotalo v. Kelly Servs. Inc.,* 2013 WL 5913839, at *9 (E.D. Mich. Nov. 4, 2013) (Edmunds, J.) (noting that "[a]lthough the Supreme Court, in *Gross v. FBL Financial Servs., Inc.*, [557 U.S. 167 (2009),] indicated that they would not determine whether the *McDonnell Douglas* analysis applies to ADEA claims, the Sixth Circuit generally applies it in analyzing circumstantial evidence."); and *Geiger*, 579 F.3d at 622 ("we find that the *McDonnell Douglas* framework can still be used to analyze ADEA claims based on circumstantial evidence"). Plaintiff satisfies the first two prongs: she was 85 years old when Defendant undertook an adverse employment action by deciding not to renew her contract. (Compl. ¶¶ 8, 27.) Third, there is no question of fact that Plaintiff was objectively qualified for the on-call physician position when she was not renewed. *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575-76 (6th Cir. 2003) (a court "should focus on a plaintiff's objective qualifications" in determining whether the plaintiff was qualified for the job held; a court should "focus on criteria such as plaintiff's education, experience in the relevant industry, and demonstrated

24

possession of the required general skills."). Plaintiff argues that younger physicians took the on-call shifts:

- Dr. Crain, age 38, for all day shifts (selected as the "hospitalist", a new position, which Plaintiff argues was not posted and which displaced her own position);

- Dr. Pinkowski, age 22, and Dr. Nichols, age 59, for night shifts;

- Remaining day shift doctors were Dr. Glines, age 54, and Dr. Butto, age 56.

(Pl.'s Resp. 23, dkt. 32). Plaintiff admits that Drs. Pinkowski and Nichols were brought on board prior to her contract end, yet, she argues, the trier of fact could find that they were "brought on board in preparation for" her ultimate dismissal. (Pl.'s Resp. 23.) *But see Geiger*, 579 F.3d at 623 (In the Sixth Circuit, "a person is not considered replaced when his duties are absorbed by another person 'or when the work is redistributed among other existing employees already performing related work.'").

Viewing the evidence in the light most favorable to Plaintiff, the non-moving party, the Court will proceed as if Plaintiff has shown a *prima facie* case. Yet even assuming Plaintiff met this burden, she has not shown that Defendant's reasons for terminating her were pretextual. "Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. The  burden then shifts back to [the] plaintiff to demonstrate that the employer's stated reason is a pretext for discrimination." *Martin v. Barnesville Exempted Vill. Sch. Dist. Bd. of Educ.*, 209 F.3d 931, 934 (6th Cir. 2000); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Till v. Spectrum Juvenile Justice Servs.*, 805 F. Supp. 2d 354, 362 (E.D. Mich. 2011) (Edmunds, J.) (applying *McDonnell Douglas* burden shifting

analysis). Defendant meets its burden by maintaining that it terminated Plaintiff's contract because she could not perform the requirements of the position.

To establish pretext, Plaintiff must show that Defendant's given reason for failing to renew her contract "had no basis in fact, did not actually motivate the defendant's challenged conduct, or was insufficient to motivate the defendant's challenged conduct." *Lefevers*, 667 F.3d at 725 (citations omitted). Plaintiff fails to identify evidence from which a jury could find that Defendant's reasons for failing to renew her contract were pretext for engaging in age-based discrimination. Further, Hughes was the same decision-maker who had renewed Plaintiff's on-call contract in 2008, when Plaintiff was 80 years old, and signed amendments extending the terms through June 2011 (Plaintiff at age 83) and June 2013 (Plaintiff at age 85). *See Mischer v. Erie Metro Housing Author.*, 168 Fed. Appx. 709, 716 (6th Cir. Feb. 17, 2006) ("The same-actor inference, . . . allows us 'to infer a lack of discrimination from the fact that the same individual both hired and fired the employee.'"); *see also Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461 (6th Cir. 1995). Hughes, the decision-maker, was 70 years old at the time and a member of the same protected class as Plaintiff, which weakens the inference of discrimination. *See Howell v. Canton City Sch. Dist. Bd. of Educ.*, 1997 WL 413630 (6th Cir. Jul. 17, 1997); (Def.'s Mot. Summ. J. 23, dkt. 28.).  Plaintiff has not carried her burden of showing that Defendant's reasons for failing to renew her contract were pretext to engage in discrimination based on her age.

## IV.  CONCLUSION

For the reasons set forth above, the Court GRANTS in part Defendant's motion for summary judgment (dkt. 28) on Count II, age discrimination, and DENIES in part

Defendant's motion for summary judgment on the remaining counts. The Court DENIES

Plaintiff's motion for summary judgment (dkt. 26).


      **SO ORDERED.**

             s/Nancy G. Edmunds
             Nancy G. Edmunds
             United States District Judge


Dated:  January 9, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of record
on January 9, 2017, by electronic and/or ordinary mail.

             Kelly Winslow for
             Carol Bethel, Case Manager